# United States District Court
# District of Massachusetts

ROBERT ALDRICH,
    Plaintiff,

       v.                 CIVIL ACTION NO. 2009-11282-JLT

TOWN OF MILTON, ET AL.,
    Defendants.

# *REPORT AND RECOMMENDATION ON DEFENDANTS TOWN OF MILTON AND MILTON POLICE DEPARTMENT'S MOTION FOR SUMMARY JUDGMENT (#166)*

COLLINGS, U.S.M.J.

## I. Introduction

The defendants Town of Milton ("the Town") and the Milton Police

Department[1] have filed a motion for summary judgment seeking the entry of judgment on all counts of the complaint in which they are named. The plaintiff opposes this dispositive motion.

The Town seeks summary judgment essentially on two grounds. At the outset it is argued that because there were no civil rights violations arising or resulting from Sergeant Breen's ("Breen") stop of Robert Aldrich ("Aldrich") on March 9, 2007, the "Court need not reach the issue of municipal liability." (#169 at 4) However, having found in the context of Breen's motion for

---

[1] The complaint in this case was filed *pro se*, and has not been amended since *pro bono* counsel was appointed. As a matter of pleading, the Milton Police Department should have been identified as the Town of Milton. *Elliott v. Boston Police Department*, 2011 WL 1526962, *1 (D. Mass., Mar. 31, 2011). The plaintiff does not now dispute that:

> '[f]or purposes of a section 1983 action, a police department is considered a non-person' and, therefore, 'is not a suable entity.' *Curran v. City of Boston,* 777 F. Supp. 116, 120 (D. Mass. 1991); *see also Douglas v. Boston Police Dep't,* No. 10-11049-WGY, 2010 WL 2719970 (D. Mass. 2010) (dismissing suit against a municipal police department because department 'has no legal existence or liability to suit separate from the [municipality]'); *Henschel v. Worcester Police Dep't, Worcester, Mass.,* 445 F.2d 624, 624 (1st Cir.1971) (holding a police department is not a suable entity, stating: '[i]f a Police Department may be successfully sued, it is the city which will pay; the result is the same as suing the city.").

*LeBoeuf v. Town of Monson*, 2011 WL 6141012, *2 (D. Mass., Oct. 28, 2011), *Report and Recommendation Adopted by*, 2011 WL 6140901 (D. Mass., Dec. 8, 2011); *see also Boyle v. Barnstable Police Department*, 818 F. Supp.2d 284, 300 (D. Mass., 2011).

The Court shall recommend that summary judgment be entered for the Milton Police Department on this basis.

summary judgment that genuine issues of material fact do exist with respect to the circumstances surrounding that stop, the Court will not now revisit the question. The Town's initial argument is unavailing.

Secondly, the Town contends that the plaintiff's claims under *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978), must fail because it has no unconstitutional practice or policy and it has adequately trained, supervised and disciplined its officers. Aldrich disagrees with the Town's assessment, contending that genuine issues of material fact remain for the jury to decide.

## II. The Summary Judgment Standard

The purpose of summary judgment is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Rojas-Ithier v. Sociedad Espanola de Auxilio Mutuo y Beneficiencia de Puerto Rico*, 394 F.3d 40, 42 (1 Cir., 2005) (internal quotations marks and citation omitted). When considering a motion for summary judgment, "a court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

to a judgment as a matter of law." Fed. R. Civ. P. 56(a).[2] The moving party bears the initial burden of asserting the absence of a genuine issue of material fact and "[supporting] that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1 Cir., 2003)(citations omitted); *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1 Cir., 2010).

> Once the moving party alleges the absence of all meaningful factual disputes, the non-moving party must show that a genuine issue of material fact exists. This showing requires more than the frenzied brandishing of a cardboard sword. The non-moving party must point to facts memorialized by materials of evidentiary quality and reasonable inferences therefrom to forestall the entry of summary judgment.

*Certain Interested Underwriters at Lloyd's, London v. Stolberg*, 680 F.3d 61, 65 (1 Cir., 2012)(internal citations and quotation marks omitted); *Fontánez-Núñez v. Janssen Ortho LLC*, 447 F.3d 50, 54-55 (1 Cir., 2006).

In determining whether summary judgment is proper, "a court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor." *Clifford v. Barnhart*, 449 F.3d 276, 280 (1 Cir., 2006); *Guay v. Burack*, 677 F.3d 10, 13 (1 Cir., 2012).

---

[2]

Rule 56 was amended effective December 1, 2010. The summary judgment standard is now set forth in Rule 56(a), but "[the standard for granting summary judgment remains unchanged." *Ophthalmic Surgeons, Ltd. v. Paces, Inc.*, 632 F.3d 31, 35 n.4 (1 Cir., 2011).

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986))(further internal quotation marks omitted).

### III. Discussion

#### A. An Unconstitutional Practice

The First Circuit has recently had occasion to summarize the law of municipal liability:

> Generally, a municipality 'may be liable under [section 1983] if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation.' *Connick v. Thompson*, —— U.S. ——, 131 S.Ct. 1350, 1359, 179 L.Ed.2d 417 (2011) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). However, municipalities are not vicariously liable under section

1983 for the actions of their non-policymaking employees. *See Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403–04, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). They are responsible only for their own unconstitutional acts. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478–79, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Thus, a plaintiff who brings a section 1983 action against a municipality bears the burden of showing that, 'through its deliberate conduct, the municipality was the "moving force" behind the injury alleged.' *Brown*, 520 U.S. at 404, 117 S.Ct. 1382 (emphasis in original) (quoting *Monell*, 436 U.S. at 694, 98 S.Ct. 2018). Such a plaintiff must 'identify a municipal "policy" or "custom" that caused the plaintiff's injury.' *Id.* at 403, 117 S.Ct. 1382 (quoting *Monell,* 436 U.S. at 694, 98 S.Ct. 2018).

*Haley v. City of Boston,* 657 F.3d 39, 51 (1 Cir., 2011).

As in the *Haley* case, here Aldrich advances two *Monell*-type claims. The first is a claim that the Town has a practice of sanctioning the unlawful extraterritorial exercise of police power. "'Where a plaintiff claims that a particular municipal action *itself* violates federal law, or directs an employee to do so, resolving [the] issues of fault and causation is straightforward' as long as the appropriate level of culpability is established." *Haley*, 657 F.3d at 51-52 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397,

404 (1997)(emphasis in original)).  "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, - U.S. -, 131 S.Ct. 1350, 1359 (2011).

Aldrich argues that the Town has shown deliberate indifference to the constitutional rights of citizens by virtue of its established practice of allowing Milton police officers to exceed the scope of their authority.  In support of his contention, the plaintiff points to the deposition testimony of former Milton Police Deputy Chief Paul T. Nolan ("Nolan"), who testified that "[t]here was a practice in effect [that allowed officers to exercise police authority within a hundred yards (sic) outside of Milton boundaries] and I know it was taught to officers in the police academy, yes." (#206-1, Exh. A at 30-31)  This testimony involved the so-called "100 rod" rule based upon a Massachusetts venue statute, Mass. Gen. L. c. 277 § 57. (#206-1, Exh. A at 28-29)  According to the plaintiff, however, it is undisputed that the "100 rod" rule does not apply since the distance from the reported B&E in Milton to the point where Breen stopped

Aldrich was more than 100 rods. (#204 at 7 n. 6[3])  Consequently, whether the Town had a practice of allowing its officers to exercise police powers within 100 rods outside of the Town borders is of no import for present purposes, as such a practice would have no causal connection to any constitutional deprivation alleged in this case.

Next Aldrich cites to the following exchange with Nolan:

> Q.  Well, if [Breen] was more than a hundred rods [out of the Town of Milton], does it matter how much further he was?
>
> *****
>
> A.  Not as far as I am concerned.  He was investigating a felony that occurred in our jurisdiction.  With the direction of flight of the vehicle heading into Boston, I

---

[3]

This statute provides:

> A crime committed on or within one hundred rods of the boundary line of two counties may be alleged to have been committed, and may be prosecuted and punished, in either county; and if committed on or within fifty rods of the boundary line of two judicial districts, it may be alleged to have been committed, and may be prosecuted and punished, in either district. A crime committed upon the sea within one league of the shore may be prosecuted and punished in an adjacent county.

Mass. Gen. L. c. 277 § 57.

The Court reads the provision as dealing with the jurisdiction of courts.  In the absence of any Massachusetts law providing that this statute also applies to police actions over town or city boundaries, the Court rules that is cannot be used to justify a stop by a Milton police officer in the City of Boston regardless of how many rods over the border the stop occurred.

> would consider him derelict in his duties not to have
> gone over the line and looked for that vehicle.

#206-1, Exh. A at 22.

This testimony does not evidence a Town practice or policy of sanctioning any unlawful extraterritorial exercise of police power. Nolan was not condoning, for example, a stop without reasonable suspicion or an arrest without probable cause.[4] Rather, he was approving an ongoing investigation of a felony that allegedly occurred in Milton into the city limits of Boston. Such practice in itself is not uncommon in police work, nor is it violative of any statutory or constitutional restrictions on police power. *See,* e.g., *U.S. v. Stanley,* 915 F.2d 54, 55 (1 Cir., 1990) ("The Fourth Amendment, of course, does not prevent police from engaging in investigatory activities, including observations of individuals that stop short of a search or seizure."); *Commonwealth v. Claiborne,* 423 Mass. 275, 281, 667 N.E.2d 873, 877 (1996).

Aldrich also relies on the testimony of former Milton Chief of Police, Kevin J. Mearn, as follows:

---

[4]

Nolan was of the opinion that Breen had conducted "an investigatory stop." (#206-1, Exh. A at 88) It is true that Nolan opined that, based on his review of Breen's report, Breen "had reasonable suspicion to stop [Aldrich]. I don't think it rose to the level of probable cause." (#206-1, Exh. A at 88) However, Breen would not have needed probable cause to conduct a *Terry* stop.

Q.  Did you notice when you read the report regarding Mr. Aldrich's stop that he had been stopped outside of Milton?

A.  Yes.

Q.  And did that raise any particular concern on your part?

A.  No.

Q.  Did you make any inquiry as to what basis Sergeant Breen had to stop him outside of the jurisdiction?

A.  No.

Q.  And why was that?

A.  Because I think his report indicated, you know, the actions he took on that particular incident and they were justified.

*****

Q.  Was it your understanding that he had probable cause to arrest or stop Mr. Aldrich?

A.  Yes.

Q.  What was your understanding as to what constituted probable cause on that morning?

*****

A.    A police officer can arrest outside of that individual's jurisdiction on probable cause that a felony was committed.   The crime (sic) that had been committed were, as I remember, at least one or two attempted B&Es, breaking and enterings.   Given the description of the vehicle as an SUV, dark colored, with some kind of muffler or exhaust problem but, you know, made different noise than a regular motor vehicle, the time of day, the location of the stop of Mr. Aldrich to the area in Milton, the fact that the vehicle had its headlights off, the description of a brown jacket or overcoat of some sort, the fact that Mr. Aldrich when Sergeant Breen had stopped him had removed that jacket when the vehicle had its headlights off, I think that's more than enough probable cause to make an arrest for the B&E.

Q.  What about the location of the stop?

A.  Doesn't matter.

*****

Q.  What do you mean it doesn't matter?

*****

A.   My understanding of the law is a police officer acting as a private citizen on probable cause can make such an arrest.

#206-4, Exh. D at 113-114.

This testimony is consistent with Massachusetts law.[5]

---

5

And it is in accord with Fourth Amendment:

Generally, "the validity of an extraterritorial arrest made by a police officer who lacked the official authority to arrest where the place of arrest authorizes a private person to make a 'citizen's arrest' under the same circumstances" is upheld. *Commonwealth v. Harri*s, 11 Mass App. Ct. 165, 169, 415 N.E.2d 216, 220 (Mass. App. Ct.), *rev. denied*, 383 Mass. 890 (1981)(Table). Under Massachusetts law,

> When a police officer makes a warrantless arrest outside of his jurisdiction, and not in 'fresh and continued pursuit' of the suspect within the meaning of

---

It is, by this time, well settled that the language of the fourth amendment extends its aegis to the seizure of persons as well as places, *e.g., Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), and that the warrantless arrest of persons constitutes one category of seizures which must be 'reasonable' under the dictates of the amendment. *Id.* All arrests, and indeed, seizures which lack some characteristics of formal arrests, are presumptively unreasonable unless supported by probable cause. *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981). Consequently, in evaluating whether appellant's concededly warrantless arrest was valid, the threshold inquiry must be whether there existed probable cause for such an arrest.

*U.S. v. Cruz Jimenez*, 894 F.2d 1, 4 (1 Cir.,1990); *Valente v. Wallace,* 332 F.3d 30, 32 (1 Cir., 2003) ("For a warrantless arrest, the Fourth Amendment is taken to require 'probable cause,' *Wong Sun v. United States*, 371 U.S. 471, 479, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).").

> G .L. c. 41, § 98A, then he acts as a private citizen, and the arrest will be held valid only if a private citizen would be justified in making the arrest under the same circumstances.

*Commonwealth v. Grise*, 398 Mass. 247, 250, 496 N.E.2d 162, 164 (1986).

In the Commonwealth, "a private citizen may lawfully arrest someone who has in fact committed a felony." *Grise*, 398 Mass. at 250, 496 N.E.2d at 164; *Harris*, 11 Mass. App. Ct. at 170, 415 N.E.2d at 220. That having been said, in a case where the Revere police made a warrantless arrest in Chelsea, the Massachusetts Appeals Court relaxed that standard, indicating it would uphold the arrest, "even though technically a citizen's arrest, made by the police officers in this case if the evidence at the motion to suppress establishes that the police had probable cause to believe that a felony had been committed and that the person arrested had committed it." *Harris*, 11 Mass. App. Ct. at 171-172, 415 N.E.2d at 221 (footnote omitted). The Massachusetts Supreme Judicial Court has endorsed the *Harris* reasoning. *Claiborne*, 423 Mass. at 281, 667 N.E.2d at 876-877 ("We agree that the requirements for a citizen's arrest are relaxed in the case of arrests by police officers acting outside their jurisdiction."); *Commonwealth v. Limone*, 460 Mass. 834, 841 n. 7, 957 N.E.2d 225, 231 n. 7

(2011).

Nothing in Mearn's testimony reflects his support or implementation of a practice that sanctions the unlawful extraterritorial exercise of police power. Indeed, his testimony is consonant with legal precedent. While his opinion that Breen had probable cause to arrest Aldrich could potentially conflict with a jury's finding as a matter of fact, that does not equate to encouragement of a practice of unlawful extraterritorial exercise of police power. Rather, if a jury were to find that Breen arrested Aldrich and he had no probable cause to do so, Breen would have acted in a manner contrary to what Mearn believed the law to be.

In short, the fact that Breen acted outside of Milton is not enough. There are clearly instances in which a police officer may lawfully exercise police power beyond his or her jurisdiction. The testimony of Nolan and Mearn upon which the plaintiff relies simply does not establish a policy or practice of unlawful extraterritorial exercise of police power that caused a constitutional deprivation.

Aldrich contends that the Town encouraged Breen's illegal conduct by awarding him a commendation for his actions and not repealing that commendation once the Superior Court found his testimony not to be credible

and suppressed the evidence.[6]  According to the plaintiff, the Milton Police Department's "practice of encouraging and lauding the unauthorized use of extraterritorial police power led directly to Breen's illegal stop." (#204 at 10) Of course, the instances of "encouragement" cited by Aldrich came subsequent to the allegedly illegal conduct and, as such, could not have "led directly to it."

To summarize, no genuine issues of material fact exist as to whether the Town has a practice or policy of sanctioning the unlawful extraterritorial exercise of police power by its officers.  Therefore, the Town is entitled to the entry of judgment as a matter of law on this claim.

## B. Failure To Train, Supervise and Discipline

Aldrich's second type of *Monell*-claim relates to an alleged failure to train. "Triggering municipal liability on a claim of failure to train requires a showing that municipal decisionmakers either knew or should have known that training was inadequate but nonetheless exhibited deliberate indifference to the unconstitutional effects of those inadequacies. [*Brown*, 520 U.S.] at 407, 117

---

[6]

As further evidence of encouragement of unlawful actions, the plaintiff asserts that "[f]ar from reading that [judge's] decision as a caution, one of Breen's Lieutenants assured him that the ruling was just 'the judge's opinion' and did not mean that Breen was wrong." (#204 at 6)  This reading of Breen's deposition testimony is a bit disingenuous.  The colliquy reads: "Q. Was Mr. King [the Lieutenant] of the opinion that the judge's opinion was incorrect?  A. His opinion as I recall it was that's the judge's opinion, and you know, it's not, it doesn't mean you're right or wrong, he just didn't believe the credibility of it because of the time factor, I was off on the time." (#206-3, Exh. B at 248-249)

S.Ct. 1382; *City of Canton v. Harris*, 489 U.S. 378, 387, 390 n. 10, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)." *Haley*, 657 F.3d at 52. The law is clear: "Showing that a single individual received inadequate training is insufficient for municipal liability to attach; the training program as a whole must be found faulty. *See City of Canton v. Harris*, 489 U.S. 378, 390–91, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)." *Calvi v. Knox County,* 470 F.3d 422, 429 (1 Cir., 2006).

Last year the Supreme Court addressed the parameters of a failure to train claim under § 1983:

> In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of persons with whom the [untrained employees] come into contact. Only then can such a shortcoming be properly thought of as a city policy or custom that is actionable under § 1983.

> Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed

deliberately indifferent if the policymakers choose to retain that program. The city's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution. A less stringent standard of fault for a failure-to-train claim would result in de facto respondeat superior liability on municipalities.

*Connick,* 131 S.Ct. at 1359 -1360 (internal citations and quotation marks omitted).

It is undisputed that Milton Police officers have post-secondary degrees, post-graduate degrees, and at least one, Nolan, has a law degree. (#176 ¶¶ 131,135, 139, 141; #205) The police training includes attendance at the police academy for fourteen to twenty-two weeks, followed by a Field Training Officer program for new police officers to be paired with a more seasoned veteran for six weeks of on-the-job training. (#176 ¶¶ 132, 136, 140, 148; #205) Sergeant Breen attended annual In-Service Training at the Milton Police Department, as well as other training such as criminal updates by outside instructors. (#176 ¶ 134; #205) Milton Police supervisors conduct debriefing, or spot training, after significant incidents to discuss proper criminal law and law enforcement tactics applied to a specific incident or arrest. (#176 ¶ 146; #205) Officers are updated at roll call at the beginning of shifts. (#176 ¶ 150; #205) Legal

updates were regularly received from outside vendors and forwarded to police officers through their shift commander's announcements at roll call, as well as via email. (#176 ¶ 145[7]) Milton Police officers have access to training materials kept in the training officer's office as well as Department Policies and Procedures, both in hard copy and on Department computers. (#176 ¶¶ 153, 154; #205) All Milton Police officers receive a copy of the Department Rules and Regulations, which are updated periodically with new standard operating procedures and totally revised every five years. (#176 ¶ 155; #205) As discussed, *infra,* Milton Police officers are trained in racial profiling and diversity issues. (#176 ¶¶ 157-159; #205)[8]

During the time that former Chief of Police Mearn was in charge, i.e., from 1992 to late 2007, Milton police officers received annual

> in-service training and it's usually around 40 hours a year and it usually entails firearm requalification, law updates, motor vehicle updates, first responder

---

[7]

The plaintiff objects to any consideration being given to training provided by Attorney John Scheft, an outside vendor, because it was not given to the rank and file. This training included instruction and handout materials on motor vehicle stops, search and seizure and territorial jurisdiction for police. (#176 ¶¶145, 151, 152; #205) However, it is "the training program as a whole" that must be taken into account. *Calvi,* 470 F.3d at 429.

[8]

Because Aldrich takes issue with consideration of the training that the Milton police currently receive because it does not evidence what the officers received in 2007 or earlier, the Court has not included it. (#205 at 5-6)

> training. Usually it was put on by the Massachusetts
> Criminal Justice Training Council, so we used to send
> officers...to those trainings and then we augmented
> that with additional in-service training that we offered
> within the town, the department.

#206-4 at 57.

Mearn testified that there was no set amount of in-service training every year,

that it mostly varied within budgetary constraints with preference being given

to trainings by the Training Council. (#206-4 at 57-60)

Based on this undisputed evidence, the "stringent standard" set forth in

*Connick* has not been met. As a matter of law it cannot be said that Milton

police training was so inadequate so as to "amount to deliberate indifference to

the rights of persons with whom the [untrained employees] come into contact."

*Connick*, 131 S. Ct. at 1359 (quoting *Canton v. Harris*, 489 U.S. 378, 388

(1989)(alteration in original)); *see also Calvi*, 470 F.3d at 429; *Santiago v.

Fenton*, 891 F.2d 373, 382 (1 Cir., 1989)("Provision of only four hours of

training, without more, does not amount to [deliberate indifference].") This

conclusion is underscored by the fact that Aldrich has presented no evidence of

similar occurrences. "A pattern of similar constitutional violations by untrained

employees is ordinarily necessary to demonstrate deliberate indifference for

purposes of failure to train." *Connick*, 131 S.Ct. at 1360 (internal citation and quotation marks omitted).

The plaintiff's claim that the Town does not supervise the Milton Police Department requires minimal discussion. Aldrich's contention rests on the actions and/or inactions of Robert Sweeney ("Sweeney"), the Chair of the Milton Board of Selectman. (#204 at 13-14) However, as the Town notes, Sweeney was not elected to the Board of Selectman until 2010 so he has no personal knowledge of Board activities in 2007, the relevant time period. (#206-6 at 28)

Aldrich asserts that his complaint to the Milton Police Department was buried rather than investigated. (#204 at 18-19) The Milton Police have a protocol in place to investigate citizen complaints. Upon receipt of a citizen complaint, it is the Deputy Chief's responsibility to conduct an investigation, make findings and inform the Chief of Police and the complainant of the findings. (#176 ¶ 117; #205) Nolan, the Deputy Chief, has received specific training in how to conduct police Internal Affairs Investigations. (#176 ¶ 118: #205) Nolan had previously investigated citizen complaints which he founded substantiated, which occurs more than 10% of the time, at which times he may

have recommended discipline to the Police Chief. (#176 ¶ 119; #205)

At the time of the incident in March, 2007, Nolan reviewed reports by Breen and the responding officers, and had spoken to Detective Purcell and then reviewed the detective's nine-page investigatory follow-up reports. (#176 ¶¶ 120, 121; #205) Upon receiving Aldrich's complaint about one year after the incident, Nolan read the decision on the motion to suppress, went back to the scene of the B&E, spoke with Breen and reviewed the plaintiff's criminal history. (#176 ¶¶ 122-126; #205) Nolan found the plaintiff's complaint was "not sustained" and so advised Aldrich in writing about three weeks after the complaint was lodged. (#176 ¶¶ 129-130; #205)

Even assuming for present purposes that this investigation was flawed or inadequate because Nolan did not interview Aldrich or any other witnesses, this simply is not enough to rise to the level of a constitutional violation. As the First Circuit has explained,

> that [the] investigation was deficient, without any
> other supporting evidence of deficient investigatory
> practices, [] is insufficient to establish a civil rights
> violation. This single poorly performed investigation
> may reflect negligence, but we fail to see how it reflects
> callous or reckless indifference by [the mayor] to the
> constitutional rights of citizens. Additionally, the
> affirmative link between this alleged investigatory

> deficiency and [the police officer's] violation of [the plaintiff's] constitutional rights is insufficient to establish liability. *Cf. Kibbe v. Springfield*, 777 F.2d 801, 809 (1st Cir.1985), *cert. granted*, 475 U.S. 1064, 106 S.Ct. 1374, 89 L.Ed.2d 600 (1986), and *cert. dismissed*, 480 U.S. 257, 107 S.Ct. 1114, 94 L.Ed.2d 293 (1987) (police department's apparently sloppy post-shooting investigatory procedures alone were not linked sufficiently with harm to impose municipal liability).

*Febus-Rodriguez v. Betancourt-Lebron*, 14 F.3d 87, 95 n. 11 (1 Cir., 1994).

This reasoning disposes of the plaintiff's failure to investigate claim.

Aldrich complains that the Milton Police Department "does not discipline its own in any meaningful way that is likely to deter the misconduct at issue." (#204 at 15) In this case, the plaintiff contends that Breen was commended for his actions, rather than disciplined. Aldrich points to no other citizen complaints against Breen in his thirty-plus year career with the Milton Police Department. Plaintiff has proffered no evidence to suggest that Breen engaged in any other allegedly unconstitutional actions.[9] As the First Circuit has concluded, "we cannot hold that the failure of a police department to discipline in a specific instance is an adequate basis for municipal liability under *Monell*."

---

[9] Breen was disciplined in 1991 or 1992 for responding to a subpoena to testify for a friend in a DUI case. (#205 ¶¶ 23-25; #225 at 7)

22

*Santiago,* 891 F.2d at 382 (citations omitted). In addition, there has been no affirmative link shown between the supposed failure of the Milton Police Department to discipline Breen, and Breen's alleged unconstitutional actions in March, 2007. *Febus-Rodriguez,* 14 F.3d at 94.

Apart from Breen's conduct, the plaintiff points to a handful of instances of "serious misconduct" by other officers which occurred both before and after March, 2007. (#204 at 16; #205 ¶¶ 26, 39, 41, 51, 53, 55) Punishment was meted out for only one of these ten incidents. (#205 ¶ 50[10]) The type of conduct involved ranged from domestic abuse[11] to excessive use of force to a false representation that an officer was entitled to a salary increase under the Quinn Bill.[12] (#205 ¶¶ 26, 51, 53) Certain of the incidents are, in reality, *de minimis,* while the nature of others is completely unknown. Whether certain of the complaints had any merit or basis in fact is unknown. The timing of

---

[10] The nature of at least two of these complaints is unknown. (#205 ¶ 51)

[11] One of these instances occurred in or around 1995 in the context of divorce proceedings. (#211 at 2)

[12] The officer was paid for having a bachelor's degree, which would mandate 20% more in an officer's pay, rather than an associate's degree, which calls for 10% more in an officer's pay. (#205-6 at 36) The officer informed the Milton Police Department that he had received the money in error. (#205-6 at 36-37)

these incidents, some of which are unknown, ranges over a period of about twenty-four years. In short, the plaintiff's evidence is gauzy. Even considering all of these instances of "serious misconduct" in toto, they are inadequate to evidence such a pervasive pattern of failure to discipline as would support a policy of lawlessness in the Milton Police Department so that the officers thought "they were above the law." *Bordanaro v. McLeod,* 871 F.2d 1151, 1162-1163 (1 Cir.), *cert. denied,* 493 U.S. 820 (1989). Moreover, again, Aldrich has offered insufficient evidence to establish "an affirmative link" between the purported lack of discipline and any alleged constitutional violations that occurred in March, 2007. *Febus-Rodriguez,* 14 F.3d at 94.

Lastly, the plaintiff drops a footnote in his opposition stating that "[t]he Milton defendants have not moved for summary judgment on Aldrich's claim under § 1983 that he was the subject of racial profiling in violation of his rights under the Fourteenth Amendment, and so this claim is not before the Court now." (#204 at 1 n. 1) This assertion is patently incorrect.

Aldrich's racial profiling claim in his complaint is as follows: "Failure to properly train and supervise Milton Police Officers prohibiting Racial Profiling." (#1, A. Cause of Action Against The Defendant: Town of Milton at # 9 and B.

Cause of Action Against The Defendant: Milton Police Dept. At #9) In its summary judgment motion, the Town seeks the entry of judgment as a matter of law "on all counts of the Complaint against" it. (#166 at 1) On the claim of failure to train, in addition to arguing generally with respect to the sufficiency of its police training, the Town directly states that "[t]he Milton Police has also undertaken extensive training in racial sensitivity and diversity provided by numerous outside instructors dating back to at least 1995," citing to specific undisputed facts. (#169 at 18) Further, in its reply memorandum, the Town disputes the Aldrich's contention:

> Plaintiff's opposition erroneously notes that somehow there is a viable claim for 'racial profiling' about which the Town did not move for Summary Judgment. The Complaint 'Count' Nine mentions 'racial profiling' in the context of training, the entirety of which reads: 'Failure to Properly Train and Supervise Milton Police Officers prohibiting Racial Profiling.' The Town Defendants dedicated fully five pages of its legal memorandum and thirty two paragraphs of facts to the <u>Monell</u> issue and evidence of training its officers. These factual assertions are substantially unrebutted, and Chief Wells (sic) affidavit outlines the extensive racial diversity training and awareness at the Milton Police Department that predated the Plaintiff's encounter with Sergeant Breen in 2007.

#225 at 2 n.1 (internal citations omitted).

The plaintiff has filed nothing further in response to the Town's clearly articulated position.

Aldrich was on notice that the Town was seeking summary judgment on the racial profiling failure to train claim. At this juncture, the dispositive motion on this point stands unopposed. The Town has offered evidence that Breen had received training in racial profiling probably on three occasions in the ten years prior to his deposition. (#176-4, Exh. D at 119) That training "was in conjunction with the motor vehicle stops, and ...recording ethnicity on the motor vehicle stops." (#176-4, Exh. D at 119) The training, with sessions lasting was about six hours, was related to a Northeastern University study on racial profiling and "along the lines of getting along with other people type training, diversity training." (#176-4, Exh. D at 119)

Further, in his affidavit[13], Milton Police Chief Richard G. Wells, Jr. ("Wells") states:

> 6. Training provided to the Milton Police Department has included not only criminal law updates and law enforcement tactics, but has also included significant

---

[13]

Relying on this affidavit, the Town states as an undisputed fact that "[c]urrent Milton Police Chief Wells establishes that training provided to the Milton Police Department has included not only criminal law updates and law enforcement tactics, but has also included significant training concerning cultural diversity and racial sensitivity." (#176 ¶ 158) The plaintiff has not challenged this statement. (#205)

training concerning cultural diversity and racial sensitivity.

*****

8. The Milton Police Department took several proactive and significant training measures in the area of Cultural Diversity beginning in 1995....To achieve these philosophical changes, the Department recruited numerous facilitators.

9. In 1995 the Milton Police Department became the *first* municipal agency within the Commonwealth to request and be awarded technical *Community Based Training* from the United States Department of Justice....During this multi year period all members of the police department received specialized training in Community Oriented Policing strategies and practices. Each officer as well as many members of the community including the clergy, elected officials, teachers, parents and citizens participated in numerous workshops and forums. These workshops covered the many cultural and diverse issues, as well as fostering effective communication among the community, while developing effective dialogue focused on the reduction of fear and violence.

10. In 1999,...the Department sought and was awarded a federal grant to engage in a training partnership with *Facing History and Ourselves of Brookline Mass*. This private collaborative was chaired by the distinguished Jimmie Jones who had partnered with retired Boston Police Deputy Superintendent William Johnson. These gentlemen have a national reputation in the arena of civil rights training and cultural issues....

*****

12. In early 2001, NCCJ (National Conference for Community and Justice) conducted a series of (16) hour trainings for every member of the department. Their focus was to build bridges of 'trust and understanding' between members of the Milton Police Department and our citizens, particularly people of color....

\*\*\*\*\*

14. In 2004 the police department once again partnered with the NCCJ to provide specific training in the area of diversity and race issues....

15. The focus of this training was to impart upon each participant the need to be professional and courteous at all times. NCCJ's goal during these forums was to continue to educate officers on the many differences that exist between races and ethnic backgrounds.

#176-33, Exh. GG.

In the face of this evidence, there is nothing to suggest that the racial profiling training the Milton Police Department received prior to the incident on March 9, 2007, was inadequate so as to "amount to deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Connick*, 131 S.Ct. at 1359 (quoting *Canton v. Harris*, 489 U.S. 378, 388 (1989) (alteration in original). Consequently, the Town is entitled to summary judgment on the racial profiling failure to train claim.

## IV. Recommendation

For all of the reasons stated, I RECOMMEND that Defendants Town of Milton and Milton Police Department's Motion for Summary Judgment (#166) be ALLOWED.

## . *Review by the District Judge*

The parties are hereby advised that any party who objects to this recommendation must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply to file objections shall preclude further appellate review. *See Keating v. Secretary of Health and Human Services*, 848 F.2d 271 (1 Cir., 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1 Cir., 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1 Cir., 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1 Cir., 1982); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1 Cir., 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

*/s/ Robert B. Collings*

ROBERT B. COLLINGS
United States Magistrate Judge

July 9, 2012.